AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Missouri

In the Matter of the Search of )
)
THE ELECTRONIC DEVICES DESCRIBED IN ) Case No. 4:22 MJ 1023 JMB
ATTACHMENT A. )
) SIGNED AND SUBMITTED TO THE COURT FOR
) FILING BY RELIABLE ELECTRONIC MEANS
)

**APPLICATION FOR A SEARCH WARRANT**

I, Elizabeth McMullan, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:
THE ELECTRONIC DEVICES, more fully described in Attachment A.

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., 841, 846 | distribution of a controlled substance and conspiracy to possess with the intent to distribute a controlled substance |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under penalty of perjury that the foregoing is true and correct.

*Applicant's signature*
Elizabeth McMullan, Special Agent, DEA
*Printed name and title*

Sworn, to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: 1/6/2022

*Judge's signature*

City and state: St. Louis, MO

Honorable John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jeannette S. Graviss

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| ) | No. 4:22 MJ 1023 JMB |
| THE ELECTRONIC DEVICES, MORE ) | |
| FULLY DESCRIBED IN ATTACHMENT ) | **FILED UNDER SEAL** |
| A. ) | |
| ) | SIGNED AND SUBMITTED TO THE COURT FOR FILING |
| ) | BY RELIABLE ELECTRONIC MEANS |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT

I, Elizabeth McMullan, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, electronic devices (depicted in Attachment A), which are currently in law enforcement possession, and the extraction from those devices of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been since January 2020. I have received 18 weeks of training in drug investigations and related legal matters at the DEA Training Academy in Quantico, Virginia. I have training in investigations of narcotics trafficking, money laundering, complex conspiracies, and among other things, have conducted or participated in surveillance, the execution of search warrants, and debriefing of informants. Prior to my training with DEA, I worked for four years as a financial analyst for Lockheed-Martin Corporation. I am currently assigned to the St. Louis Division and previously spent six months temporarily assigned to the Atlanta Division Office. During my time

with DEA, I have supported investigative teams for numerous complex investigations of drug-trafficking organizations dealing in heroin, methamphetamine, cocaine, marijuana and other controlled substances. These investigations have resulted in the seizure of heroin, methamphetamine, marijuana, cocaine, other controlled substances and weapons. I am familiar with and have utilized normal methods of investigation, including, but not limited to visual surveillance, questioning of witnesses, the use of search and arrest warrants, the use of pen registers the use of geo-locational data and the use of court-authorized wire intercepts. Through my training, education, and experience, I have become familiar with the manner in which narcotics traffickers and money launderers conduct their operations, including but not limited to their methods of importing and distributing controlled substances, their use of telecommunication devices to include cellular telephones, their use of counter surveillance techniques, and their use of numerical codes and coded and/or cryptic language, words, and references to conduct their transactions. I am an investigative and law enforcement officer of theUnited States within the meaning of Section 2510(7) of Title 18, United States Code, and as such, I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended merely to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code,

Sections 841(a)(1) and 846 have been committed by Ashley GIBSON or other persons known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of those crimes, as described in Attachment B.

## IDENTIFICATION OF THE TARGET DEVICES

5. The devices to be searched are as follows: Target Device #1: An Apple iPhone, red in color with a clear case, and IMEI: 353044112764981; Target Device #2: an Apple iPhone, gold in color with a red case, and IMEI: 354703759161392. The Target Devices are currently in the custody of the DEA St. Louis Field Division in St. Louis, Missouri.

6. The applied-for warrant would authorize the forensic examination of the Target Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## TECHNICAL TERMS

7. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone

numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. A wireless telephone may have wireless connection capabilities such as Wi-Fi and Bluetooth.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of

    electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication Devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving

      them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    g. Internet: The internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the internet, connections between devices on the internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    8.    Based on my training, experience, and research, I know that the Target Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation Device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the Target Devices.

**PROBABLE CAUSE**

9. In late 2020, DEA began investigating the distribution of methamphetamine by Steven Bell. After conducting several controlled purchases of methamphetamine from Bell, investigators obtained court authorization to begin monitoring telephone calls and messages sent to and from a telephone known to be used by Bell, (314) 723-0073. During the course of monitoring communications over the phone used by Bell, investigators determined that Lethem Thompson-Bey was one of Bell's methamphetamine sources of supply.

10. On March 12, 2021, investigators obtained court authorization to begin monitoring telephone calls to and from a telephone known to be used by Thompson-Bey, (573) 554-6067. On March 12, 2021, investigators intercepted telephone calls between Thompson-Bey and an unidentified woman during which they discussed burglarizing an unknown subject and location. Later that evening, the court-authorized precision location information from Thompson-Bey's phone indicated that he was traveling from St. Louis, Missouri to Lexington, Kentucky.

11. On March 13, 2021, investigators intercepted additional phone calls over Thompson-Bey's telephone regarding the burglary that had already occurred. Location information from Thompson-Bey's phone indicated that he was in Lexington, Kentucky. Thompson-Bey said that he would be driving back to St. Louis the following day.

12. On March 14, 2021, investigators were able to locate the car that Thompson-Bey was driving through the precision location information on his phone and, after Thompson-Bey drove into a corn field and became disabled, investigators searched the vehicle and located approximately 13.5 pounds of methamphetamine and $45,000 U.S. Currency.

13. Thompson-Bey told investigators that he had broken into an apartment at 300 Quinton Court, Lexington, Kentucky, that Ashley GIBSON had used to store narcotics and cash.

Thompson-Bey said that he had previously purchased eight pounds of methamphetamine from Gibson at the apartment. Thompson-Bey said that on March 12, 2021 he drove from St. Louis to Lexington, Kentucky. On March 13, 2021, Thompson-Bey and four accomplices stole approximately 27 pounds of methamphetamine and $100,000 from GIBSON's apartment. Thompson-Bey took a portion of the methamphetamine and cash and drove back towards St. Louis.

14. On March 14, 2021, GIBSON reported the burglary to the apartment at 300 Quinton Court. GIBSON told the police that a $30,000 Rolex watch and $2,000 in cash had been stolen from the apartment.

15. Thompson-Bey identified Eric Williams as his source of supply for the narcotics in Lexington and told investigators that GIBSON was working at the direction of Williams. This information was corroborated by later recorded phone calls over a series of phones used by Williams.

16. On April 5, 2021, investigators obtained court authorization to begin monitoring telephone calls to and from a telephone known to be used by Williams, (248) 983-6888. On April 20, 2021, investigators intercepted a call between Williams and GIBSON. GIBSON was using telephone number (859) 693-7712. During the call, Williams asked GIBSON, "You at the apartment?" GIBSON responded, "My house." Williams then asked, "You got the young nigga order?" GIBSON responded, "M-hmm." Based on my training and experience, I believe Williams called GIBSON to see if she was at the stash house at 300 Quinton Court so that she could deliver narcotics to an unidentified customer. When she answered that she was at her house, Williams then asked whether she had the "order" of narcotics and GIBSON responded that she did.

17. On April 22, 2021, investigators from the DEA Cincinnati/Northern Kentucky

Airport Group seized $65,250 from Haley Mason. Investigators determined through calls between Williams and Mason that Mason was transporting cash and/or narcotics for the drug trafficking organization. Mason told investigators that she had picked up the cash from a "younger, white girl," who was later identified as GIBSON. Mason said she had picked up the cash from an apartment complex in Lexington, Kentucky. Mason also said that she communicated with GIBSON by telephone at (859) 693-7336, and had previously picked up money from GIBSON on two separate occasions. Mason also said that she had communicated with GIBSON through a Facebook Messenger account in the name of "Ashkcash Dawn." In my experience, the Facebook Messenger app can be accessed through iPhones such as the Target Devices. Mason also identified GIBSON's Snapchat account in the name of "AshCash." In my experience, Snapchat is an application that is typically accessed through a cellular device such as the Target Devices. The fact that GIBSON specifically refers to herself as "Ashkcash" or "AshCash" leads me to believe that she uses the Facebook Messenger app and the Snapchat app to conduct monetary transactions related to the drug trafficking conspiracy. I believe that data from those applications will be stored on one or both of the Target Devices.

18. Mason also said that GIBSON provided her with a suitcase to take to the airport. When Mason arrived in Los Angeles, California, she was instructed to contact GIBSON by telephone to determine where to deliver the cash. The information provided by Mason was corroborated by a consensual search of Mason's cellular telephone. Investigators were able to observe the communications with GIBSON's cellular telephone through Facebook Messenger, Snapchat, and voice calls. Based on my training and experience, I believe that GIBSON used her cellular telephone extensively to communicate regarding the drug trafficking and transportation of narcotics proceeds.

19. On May 24, 2021, investigators in Lexington, Kentucky conducted a traffic stop of Miranda Jones after learning through intercepted calls over Williams' phone that she would be transporting narcotics from Detroit, Michigan to Lexington, Kentucky. Approximately 4082 grams of methamphetamine was located in the trunk of Jones' car. Jones told investigators that Williams told her to pick up the packages of methamphetamine in Detroit, Michigan and deliver them to an apartment complex in Lexington, Kentucky. Jones said that she would contact Williams upon her arrival and meet with a white female in the parking lot of the apartment complex at 300 Quinton Court, Lexington, Kentucky. The information provided by Jones was corroborated by intercepted calls between Williams and other members of the drug trafficking organization, including GIBSON. I believe that Jones had met and was going to meet with GIBSON and that GIBSON was using one or more cellular telephones to coordinate with Williams regarding the delivery of narcotics.

20. On June 1, 2021, investigators intercepted a call during which Williams told another coconspirator that "Ashley" (GIBSON) had sent money for a "load" of narcotics that Williams had received.

21. On August 25, 2021, investigators conducted a search warrant at Williams' home in Detroit, Michigan and arrested him for conspiracy to distribute narcotics. During a post arrest interview, Williams told investigators that he coordinated the delivery of narcotics from his home because he was on house arrest after violating the conditions of his federal supervised release. Williams said that he used couriers to deliver narcotics to GIBSON in Lexington, Kentucky. Based upon the intercepted telephone calls over Williams' various phones over the course of several months, I believe that Williams communicated with GIBSON by phone and other messaging apps accessed through cellular telephones.

22. On November 10, 2021, GIBSON was charged in an indictment in the Eastern District of Missouri with conspiracy to distribute narcotics. On November 16, 2021, investigators arrested GIBSON at her home in Lexington, Kentucky pursuant to the arrest warrant on the indictment. In a search incident to arrest, two cellular telephones were seized from GIBSON, **Target Device #1** and **Target Device #2**. I believe GIBSON used her cellular devices, including **Target Device #1** and **Target Device #2**, to engage in criminal activity and to act in furtherance of drug trafficking conspiracy. I believe it is apparent GIBSON was distributing methamphetamine on behalf of the DTO in Lexington, Kentucky. Furthermore, I believe it is apparent that GIBSON used her cellular devices to communicate with other members of the DTO in order to conduct drug trafficking.

23. Based upon my training and experience, I believe that evidence of GIBSON's drug trafficking activities will be maintained and stored on cellular devices in her possession, particularly because during the course of the drug trafficking conspiracy, GIBSON used the devices to communicate with coconspirators about the specifics of the delivery of narcotics and the transportation of proceeds of narcotics sales.

24. In my training and experience, I know that the Target Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Target Devices first came into the possession of the DEA.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

26.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file.)

b. Forensic evidence on a device can also indicate who has used or controlled this device. This "user attribution" evidence is analogous to a search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its

use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of Examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Devices consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to computer assisted scans of the entire medium that might expose many parts of the Target Devices to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

28. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Target Devices #1 and #2, as described in Attachment A, to seek the items described in Attachment B.

29. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize the execution of the warrant at any time day or night.

## REQUEST FOR SEALING

30. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal activity and not all of the targets of this investigation are known at this time. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and

disseminate them to other criminals as they deem appropriate, i.e., post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

I state under the penalty of perjury that the foregoing is true and correct.

1/6/2022
DATE

ELIZABETH MCMULLAN
Special Agent
DEA

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on January** 6th **2022.**

JOHN M. BODENHAUSEN
United States Magistrate Judge
Eastern District of Missouri

## ATTACHMENT A

The property/devices to be searched are:

### TARGET DEVICE #1

A RED APPLE IPHONE, IMEI: 353044112764981.

### TARGET DEVICE #2

A GOLD APPLE IPHONE, IMEI: 354703759161392.

The Target Devices are currently in the custody of the DEA St. Louis Field Division in St. Louis, Missouri.

This warrant authorizes the forensic examination of the Target Devices for the purpose of identifying electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the Target Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 (a)(1) and 846 (distribution and possession with intent to distribute controlled substances and conspiracy), to include:

   a. Lists of customers and related identifying information;

   b. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. Any information related to sources of drugs (including names, addresses, phone numbers, and any other identifying information);

   d. Any information regarding GIBSON's schedule or travel from January 2020 to the present;

   e. All bank records, checks, credit card bills, account information, and other financial records;

   f. Photographs and videos depicting GIBSON, coconspirators, drug ledgers, narcotics, narcotics proceeds, jewelry, or other items of value obtained during the course of the drug trafficking conspiracy;

   g. Incoming and outgoing call logs and toll records;

   h. Voicemails related to the drug trafficking activity;

   i. Text, SMS, and MMS messages related to the drug trafficking activity;

   j. Emails related to the drug trafficking activity;

   k. GPS, historical cell site and other location information;

   l. Internet browsing history and searches, caches, "cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

2. Evidence of user attribution showing who used or owned the Target Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage, such as flash memory or other media that can store data, and any photographic form.